### SOUTHERN INDUSTRIES OF CLOVER, LTD., Plaintiff,

### v.

### RUDI HARDICK AND ATLANTIC AND PACIFIC MILLS, INC., Defendant.

No. 92 Civ. 5750 (BN).

United States District Court, S.D. New York.

Oct. 26, 1998.

Walter F. Ciacci, White Plains, NY, for Plaintiff.

Barry Apfelbaum, P.A., Orlando, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge (sitting by designation).

#### Introduction

Plaintiff, Southern Industries of Clover, Ltd. (plaintiff or "Southern"), located in Bronx County, New York is a wholesaler of yarn. Southern brings this diversity action under 28 U.S.C. § 1332(a)(1) to recover the sum of $688,237.61, plus interest, representing an alleged unpaid balance due Southern for the purchase of yarn by defendant Atlantic and Pacific Mills, Inc. ("Atlantic"), a Florida corporation and manufacturer of clothing.

Southern also seeks recovery against defendant Rudi Hardick (also known as Rudy or Rudolph Hardick), a Florida resident, under a personal payment guaranty dated No-

vember 21, 1989 and executed on December 1, 1989 (the "subject guaranty" or exhibit 13).

The outstanding indebtedness of $688,-237.61 covers only the so-called "new" shipments to Atlantic made after Southern's receipt of Hardick's guaranty executed on December 1, 1989 and the amount itself is not in dispute. Atlantic, which is out of business and insolvent, has by letter of its counsel dated June 14, 1993 consented to the entry of judgment against it for the outstanding balance of $688,237.61. Accordingly, the court addresses only the issues relevant to the personal liability of Hardick under the subject guaranty.

Hardick strenuously maintains that since the subject guaranty constitutes a promise to answer for the debt of another, it falls within the purview of the statute of frauds (New York General Obligations Law, § 5–701(a)(2)); and since he did not actually sign the guaranty, he cannot be held personally liable as a guarantor of Atlantic's debt.

Southern, on the other hand, insists that the evidence, including the subject guaranty itself, shows the guaranty was signed by Hardick. Nonetheless, Southern urges, even if the court should find that Hardick did not actually sign the guaranty, based on the facts of this case Hardick should be held equitably estopped from denying he signed it and thereby precluded from relying on the statute of frauds to shield him from personal liability as Atlantic's guarantor.

Accordingly, in light of the fact that the corporate defendant has consented to the entry of judgment against it, the only remaining issues revolve around: (1) whether or not Hardick actually signed the guaranty, and (2) if not, whether the doctrine of equitable estoppel precludes Hardick's denial that he signed the guaranty and his reliance on the statute of frauds.

At a bench trial held on May 21, 1998,[1] plaintiff adduced the testimony of Hardick, Lawrence S. Kryger (plaintiff's president), the deposition dated July 29, 1994 of Dick Stuart (Hardick's "partner" and "production man" at Atlantic), the deposition of July 29, 1994 of Stephanie Watson (an employee of Atlantic who signed the guaranty as a witness to Hardick's signature), and various documentary exhibits. Defendant Hardick testified on his own behalf and submitted copies of cancelled checks purporting to bear his signature and show the signature purporting to be his on the guaranty is not authentic.

Based upon the following findings of fact and conclusions of law, the court finds in favor of plaintiff against both defendants.

### Findings of fact

Southern is a wholesale distributor of yarn to the knitting industry. Lawrence S. Kryger and David Novick are the principals of Southern. Atlantic is a clothing manufacturer which purchased its yarn principally from Southern. A predecessor company of Atlantic, known as Indian River Knitting Mills ("Indiana River"), had also purchased yarn from Southern.

Hardick, doing business as Florida Mortgage and Investment Corp., factored the accounts receivable of both Indian River and then Atlantic. Together with Stuart, Hardick founded Indian River and then Atlantic. As Atlantic's sole factor of its accounts receivable, Hardick (personally and through his corporation) acted as the financial backer of Atlantic (Tr. 82); both Atlantic and Indian River were operated on a day to day basis by Stuart. Hardick was in charge of Atlantic's finances and (according to Stuart) Atlantic's president (Tr. 42–43).

As neither Indian River nor Stuart personally had a credit standing, at the outset of doing business Southern obtained personal and corporate guaranties executed by Hardick for the debts of Indian River, e.g., exhs. 14, 15, 15a, 16. Thus, there is in evidence four guaranties on behalf of Indian River signed by Hardick: One dated June 17, 1986, two guaranties signed by Hardick as president of Central Florida Mortgage dated March 29, 1988 (with two witnesses to the signature), and a guaranty signed by Hardick dated March 18, 1988 as president of Central

---

1. Judge Deborah A. Batts restored this case to the active calendar on November 20, 1997, and this action was reassigned to the writer on April 28, 1998.

Florida Mortgage (with two witnesses to the signature). A financial statement was appended to three of the four guaranties. Tr. 17. At a time when Indian River had no corporate credit history, the foregoing guaranties furnished by Hardick established the necessary credit link between Indian River and Southern to facilitate the Indian River's purchases of yarn on credit, and coincidentally created reliance by Southern on Hardick as the "money man" at Indian River and subsequently at Atlantic (Tr. 34, 43). Stuart was the day to day "production" man (Tr. 43, 52), and was not involved in credit or financial matters on behalf of Indiana River or its successor, Atlantic.

Apparently due to an established financial relationship between Southern and Hardick, Southern initially sold yarn to Atlantic solely on the credit of Atlantic without Hardick's guaranty of payment. However, by 1989 "Atlantic had gotten to the point where they were running substantially behind with their payments to Southern Industries" (Tr. 13), payments were being received sporadically with a cumulative arrears of $500,000 to $600,000. Given the uncreditworthiness of Atlantic, as a condition to extending Atlantic further credit (Tr. 13, 59), sometime in 1989 Southern started making demands on Hardick for his personal guaranty of Atlantic's debt, as he had previously provided for Indian River. Thus, as a condition to extending further credit and making new shipments to Atlantic, Southern, "requested on more than one occasion" (Tr. 12) that Hardick personally guaranty payment of Atlantic's debt for new shipments of yarn.

A guaranty form prepared by Southern in substantially identical form to that previously signed by Hardick on behalf of Indian River was sent to Hardick for his signature under cover of a letter dated December 21, 1989 (Tr. 97), and the guaranty was the subject of numerous negotiations and conversations between Kryger and Hardick. In those conversations, Kryger made it quite clear to Hardick that credit could no longer be extended for the purchase of yarn by Atlantic without the guaranty of payment by Hardick, and that Kryger would cut off supplies of

yarn to Atlantic. In short, Hardick concededly was vigorously pursued by Southern for the guaranty so that Southern could continue to ship yarn to Atlantic on credit (Tr. 13, 101, 105). As put by Kryger, in response to whether he relied on the guaranty from Hardick in making new shipments to Atlantic: "If this guaranty did not get executed, they [Atlantic] were out of business and we would stop shipping. It was as simple as that" (Tr. 62).

Hardick assured Kryger many times and stated to Stuart that he (Hardick) would sign the subject guaranty; never once did Hardick express any objection to either Kryger or Stuart concerning signing the subject guaranty (Tr. 47, 59, 61).

Shortly following Southern's "ultimatum" (Tr. 59) to Hardick for his personal guaranty, the guaranty was received by Southern's office by mail in December 1989. The form, exhibit 13, is purportedly signed by Hardick, and the latter's signature was witnessed by Stephanie Watson (an employee of Atlantic and Stuart's daughter (Tr. 49)). Moreover, the guaranty was accompanied by Hardick's financial statement. Under all the facts and circumstances of this case, Hardick's testimony that he did not sign the subject guaranty is not credible, and his signature as guarantor and Watson's signature as a witness to the signing of the document by Hardick will be accepted by the court as authentic.

Southern's acceptance of exhibit 13 and reliance thereon as a guaranty signed by Hardick was clearly reasonable and justifiable. First, the disputed signature on the subject guaranty, exhibit 13, appears strikingly similar to the witnessed signatures of Hardick on the identical forms of guaranty provided for Indian River; second, Kryger was not familiar with Hardick's signature; third, the signature on the guaranty purporting to be that of Hardick was witnessed by Stephanie Watson, an Atlantic employee; fourth, at the time he received the guaranty, Kryger did not compare the signature on the guaranty with that on checks he had received from Hardick;[2] fifth, in the ordinary course

2. With reference to the signatures on the checks

offered in evidence by defendant purportedly

of its business Southern did not scrutinize signatures on documents to ascertain whether they were genuine; sixth, Hardick had previously guarantied the debt of Indian River and therefore, the guaranty for Atlantic was not unusual; seventh, in response to the demands for the guaranty on behalf of Atlantic, Hardick had never objected to a guaranty, and indeed he repeatedly assured Kryger that the guaranty would be forthcoming, and finally, Southern was led to believe that Hardick was the "money man" behind Atlantic. Accordingly, under the foregoing circumstances Southern's acceptance of exhibit 13 and Hardick's signature thereon as authentic was reasonable, if not compelling.

Moreover, the record leaves no doubt that Southern made the new shipments solely in reliance on the subject personal guaranty, Hardick's prior conduct and assurances with reference thereto, and Hardick's subsequent silence concerning any problem with regard to the signature on the document when he had a duty to speak if there were a problem. Kryger adamantly testified: "[W]ithout the guaranty, nothing would have been shipped." Tr. 64.

Following receipt of the subject guaranty and solely in reliance thereon, Southern shipped new product to the uncreditworthy Atlantic, amounting to approximately $700,-000 over a period of approximately one and one-half years, until September, 1991. (Tr. 63, 80).

The court finds that Hardick was fully aware of the new shipments received by Atlantic after December 1, 1989, and clearly understood that Southern would not have shipped new goods to the uncreditworthy Atlantic without the guaranty. Thus, at the very least, by late in December, 1989, Hardick was well aware of the following facts: Southern would cut off yarn shipments unless Hardick gave his personal guaranty of

payment; Hardick had repeatedly assured Kryger that the guaranty would be forthcoming; and new shipments of yarn were being made to Atlantic in reliance on the guaranty. Moreover, multiple letters were sent by Southern to Hardick dated June 26, 1991 (exh. 2), July 10, 1991 (exh. 3), July 15, 1991 (exh.5), August 14, 1991 (exh. 6), February 27, 1992 (exh. 9), May 20, 1992 (exh. 10), June 17, 1992 (exh. 11) alluding to the guaranty executed on December 1, 1989 demanding payment, and threatening legal action. Significantly, over the period of time in 1989, 1990 and 1991 approximately $700,000 in new shipments were made to Atlantic, and even well into 1992 Hardick never disputed the guaranty, but rather remained silent concerning the signature on the guaranty (Tr. 25–26).

True, Kryger's letters of May 20, 1992 and June 17, 1992, exhibits 10 and 11, indicate that Hardick had orally requested a copy of the guaranty and ostensibly had questioned his personal liability under the guaranty. Pursuant to Hardick's request, Southern sent Hardick copies of the executed guaranty under cover of exhs. 10 and 11, and still, Hardick admittedly did not dispute the guaranty in writing (Tr. 26).

Even after Hardick had received the copies of the subject guaranty from Southern he had requested, he failed to exercise due diligence by making inquiry of Atlantic's personnel concerning his purported signature, especially of Ms. Watson, who had purported to have witnessed Hardick's signature on the guaranty. If Hardick had not signed the guaranty, as he claims, then plainly Watson's signature as a witness was fraudulent, and she had some explaining to do concerning the aiding and abetting of the forgery of Hardick's signature on the document, and possibly the fraudulent use of his financial statement (Tr. 36–37). Watson's deposition

---

signed by Hardick and sent to Southern, Kryger testified: "[E]very signature is so different that I would have to qualify as an expert to know that they're the same. * * * They [the signatures on the checks] looked—jumping all over the place." (Tr. 85). In explaining why he had not scrutinized the signature on the subject guaranty, Kryger testified that he had handled a thousand guaranties in his life and the subject guaranty of

Hardick was the first incident he had encountered where the defense was that the signature on the document was not that of the purported guarantor.

Although the factual issue of the genuiness of the signature on the guaranty as that of Mr. Hardick is in sharp dispute in this case, a handwriting expert was not called by either party.

indicates that she had·a lapse of memory concerning the circumstances under which her signature was placed on the subject guaranty (Tr. 49).[3]

Hardick testified that after he received a copy of the guaranty from Southern, he phoned Kryger and said that he had not signed the guaranty (Tr. 27–28). Even if Hardick's alleged phone call in 1992 disputing his signature were credible, the record is clear that by September, 1991 Southern had already completed the new shipments under the guaranty, and during that time Hardick had remained silent that he had not signed the guaranty.

In any event, the court finds Kryger's testimony that he never received a telephone call from Hardick disputing the signature on the guaranty (Tr. 71, 73) more credible; and the court finds that the issue concerning the signature on the guaranty was in fact raised for the first time after the commencement of this action, as claimed by plaintiff.

### Conclusions of law

#### 1.

■ Atlantic's failure to pay the undisputed balance due Southern of $688,237.61, and Hardick's refusal to pay such undisputed balance as guarantor constitute breaches of contract by both defendants. As Atlantic has consented to judgment, a judgment shall be entered for Southern against Atlantic for the sum demanded, plus interest. Since the court finds that the subject guaranty of Hardick was signed by him, the New York General Obligations Law, § 5–701(a)(2), relied on by Hardick, is not a valid defense to plaintiff's cause of action for breach of the contract of guaranty.

#### 2.

■ Alternatively, assuming *arguendo* Hardick did not sign the guaranty, the court holds that because of his fraudulent and deceptive conduct and silence regarding the signing of the guaranty Hardick is equitably

estopped to plead the statute of frauds to escape liability.

To briefly reiterate the salient evidentiary points relevant to estoppel: Hardick, the sole factor of the accounts receivable of Indian River established a course of dealings with Southern involving guaranties of the company's debt. When Southern demanded a guaranty of Hardick on behalf of the uncreditworthy Atlantic and threatened to cut off yarn shipments if the guaranty was not signed, Hardick repeatedly assured Southern that the guaranty would be forthcoming. When the guaranty was received by Southern, Hardick's signature as witnessed by Watson appeared on the face of the document, and more, it was accompanied by Hardick's financial statement. Southern justifiably accepted the document as a valid and enforceable guaranty of Hardick, and then proceeded to make approximately $700,000 of new shipments to the financially defunct Atlantic over a period of approximately one and one-half years until September, 1991 in sole reliance on the guaranty. During that period, Hardick definitively knew that Southern would not have shipped the new goods without having received Hardick's personal guaranty; he also received letters demanding payment and threatening legal action, but notwithstanding a duty under the circumstances to speak, Hardick blandly remained silent that he had not signed the guaranty, obviously intending that Southern continue to ship goods in ignorance of the true facts.

Accordingly, if in fact Hardick did not sign the guaranty, under the facts and circumstances of this case Hardick cannot escape the legal consequences of his intentionally misleading conduct and concealment of material fact when there was a duty to speak concerning the signing of the guaranty, Southern's ignorance of the true facts and justifiable reliance on a guaranty *properly executed on its face*, and the prejudicial change of position by Southern. Based on the foregoing, the court agrees with plaintiff that Hardick is equitably estopped or precluded from asserting what would otherwise

---

**3.** In her deposition, Ms. Watson testified that she could not recall the circumstances under which her signature was placed on the guaranty as a witness, but she flatly denied that she had signed Hardick's name on the guaranty. (Tr. 49.)

be his rights under the statute of frauds. *See, e.g., International Minerals and Resources v. Pappas,* 96 F.3d 586, 594 (2d Cir. 1996); *In Re Ionosphere Clubs, Inc.,* 85 F.3d 992, 999 (2d Cir.1996); *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301–02 (2d Cir.1996); *Lincoln Logs Ltd. v. Lincoln Pre-Cut Homes,* 971 F.2d 732, 734 (Fed.Cir.1992).

### *Conclusion*

A judgment in the sum of $688,237.61, plus interest on said sum from July 1, 1991 (single reasonable intermediate date of all invoices pursuant to N.Y.C.P.L.R. § 5001(b)) [4] and costs will be entered against Mr. Hardick personally by the Clerk.

Atlantic has consented through its counsel via letter dated June 14, 1993 to the entry of judgment against it in the sum of $688,-237.61, plus interest from July 1, 1991 and costs, which shall also be entered by the Clerk against the corporate defendant.

SO ORDERED.

---

4. Based on the invoice dates set forth on exhibit 12.